IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Nichole S.,[1] | ) | C/A No.: 1:25-661-DCN-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND |
| Frank Bisignano,[2] Commissioner | ) | RECOMMENDATION |
| of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), finding her disability had ceased as of September 1, 2021, such that she was no longer entitled to Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Pursuant to Fed. R. Civ. P. 25(d), Frank Bisignano is substituted as a party to this action.

that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

Plaintiff filed a claim for DIB on April 19, 2017. Tr. at 67. In a determination dated October 27, 2017, Plaintiff was found to be disabled beginning February 17, 2017. Tr. at 67–79. Following a continuing disability review, Plaintiff was notified on September 27, 2021, that she was no longer considered disabled effective September 1, 2021, and that her benefits would cease on November 30, 2021. Tr. at 128–29. Plaintiff requested reconsideration. Tr. at 147–48. She subsequently participated in a hearing by telephone with a disability examiner. Tr. at 123. On November 1, 2022, the disability examiner issued a decision finding Plaintiff's disability had ceased on September 1, 2021. Tr. at 172–80. Plaintiff next requested a hearing before an Administrative Law Judge ("ALJ"). Tr. at 191.

Plaintiff had a hearing by video teleconference before ALJ Mary Ryerse on June 21, 2023. Tr. at 40–66 (Hr'g Tr.). The ALJ issued an unfavorable decision on December 29, 2023, finding that Plaintiff's disability had ended by September 1, 2021, and that she was not disabled within the meaning of the Act. Tr. at 14–39. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the

Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on February 4, 2025. [ECF No. 1].

### B. Plaintiff's Background and Medical History

#### 1. Background

Plaintiff was 49 years old at the time of the hearing. Tr. at 46. She completed some college. *Id.* Her past relevant work ("PRW") was as an advertising sales representative, a uniform sales representative, and a furniture salesperson. Tr. at 62. She alleges she has been unable to work since February 2017. Tr. at 577.

#### 2. Medical History

##### a. Evidence Prior to October 2017 Disability Finding

On April 7, 2017, Plaintiff underwent surgery to treat mastodynia, remove defective and infected breast implants, and biopsy enlarged bilateral lymph nodes. Tr. at 479–81. Susan E. Kolb, M.D. ("Dr. Kolb"), noted Plaintiff's implants were leaking bilaterally and that she had evidence of biotoxin disease on visual contrast sensitivity tests. Tr. at 479–80.

Plaintiff presented to nurse practitioner Amber S. Green ("NP Green") for a consultative medical exam on September 5, 2017. Tr. at 576–80. She reported fatigue, weakness, frequent dizziness, unsteady gait, blurred vision, ringing in her ears, and mold and fungal infections from breast implant

leakage. Tr. at 577. She stated her symptoms had begun after having breast implants inserted in 2008 and had worsened over time. Tr. at 576. Plaintiff said she could not cook, dress herself, or go to the restroom alone and required her husband's assistance to perform other activities of daily living ("ADLs"). Tr. at 577. She indicated she had experienced worsening confusion, memory loss, and inability to recall conversations or items over the prior eight- to nine-month period. *Id.* She reported pain in "every single joint" and rated it as an eight to nine on a 10-point scale. *Id.* She stated her pain was worsened by cold. *Id.* She said she could not sit for longer than 15 minutes without her pain increasing and required assistance to walk and move from a sitting to a standing position. *Id.* She endorsed depression. *Id.*

NP Green observed that Plaintiff "appears to be in acute distress with transitioning from waiting area to exam room, and from merely sitting in chair" and "[d]oes not fully articulate words, speaks quietly and seems like it takes an effort to talk." Tr. at 578–79. She noted Plaintiff's range of motion ("ROM") was limited with passive and active testing in the cervical spine, lumbar spine, shoulders, hands, hips, knees, and ankles, and that she complained of pain to palpation all over her body. Tr. at 579. She stated Plaintiff had weak and unsteady gait, could not place her shoes on without assistance, and could not walk, move from sitting to standing, or move from standing to sitting without assistance. *Id.* She noted decreased muscle

bulk/tone and indicated Plaintiff was unable to reach her arms above her head. *Id.* NP Green recorded slightly-reduced deep tendon reflexes ("DTRs") bilaterally, 4/5 strength throughout, and intact, but slow gross and fine motor skills. *Id.* She stated Plaintiff's affect was flat, she did not smile, and it was difficult to assess her true mood. *Id.*

NP Green assessed fibromyalgia, chronic fatigue, chronic arthralgias, and mold/fungus infection related to breast implant leakage. *Id.* She wrote:

> Based on examination of this claimant, she has limited mobility and impaired sensation and would be challenged to complete the following: [l]ifting, carrying, pushing, pulling[,] [s]itting, standing, walking[,] bending, kneeling, balancing, stooping, [h]andling, gripping, reaching forward or overhead, [v]ision, hearing, or speech[,] [e]xposure to heat, cold, humidity, or noise, or vibration[.]

Tr. at 579–80.

Plaintiff participated in a consultative psychological evaluation on October 21, 2017. Tr. at 583–85. She endorsed mild-to-moderate depressed mood on most days, low energy, low motivation, sleep disturbance, and loss of interest. Tr. at 583. She said she did not "do a lot" on most days because she did not feel well. Tr. at 584. She said she was unable to move around, could not read for long periods, and required help with self-care and managing finances. *Id.*

Chad C. Ritterspach, Ph.D. ("Dr. Ritterspach"), observed on mental status exam that Plaintiff had good hygiene and grooming, posture and gait

within normal limits, was cooperative, informative, and had a positive attitude, demonstrated motor activity within normal limits, appeared to be an accurate source of information, maintained eye contact, had articulate speech of normal volume, showed mildly depressed mood and affect, had slowed, but logical and grounded thought processes and appropriate thought content, was able to follow simple directions, was oriented to time, place, person, and situation, had "moderately/significantly" impaired concentration for delayed auditory recall, had intact insight and judgment, could not spell "world" backward, recalled one of three words presented earlier, completed simple calculations, counted change, and was able to interpret proverbs. *Id.* He administered the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"). *Id.* Plaintiff's standard scores of 87 on verbal comprehension, 77 on perceptual reasoning, and 72 on full scale composite fell within the borderline range of intellectual functioning. *Id.* Dr. Ritterspach explained Plaintiff's scores were "well-below her past and present educational and occupational functioning," but "accurately reflect her current cognitive functioning, and likely are a result of the medical issues she has experienced—biotoxicity." *Id.* He noted Plaintiff's "cognitive abilities are significantly below baseline" and "[s]he also experiences depressive moods related to her limitations and chronic pain." Tr. at 585. He diagnosed adjustment disorder with depressive mood and indicated a need to rule out

neurocognitive disorder. *Id.* He noted the following abilities and limitations: "needs help with remembering to-dos, shopping, and money management" due to "cognitive limitations"; "would have the ability to interact appropriately with co-workers and supervisors"; "[d]ue to depression and working memory/processing speed limitations . . . she may not be suited for work with the public"; "should have no difficulty protecting herself from workplace safety hazards"; "adequate verbal reasoning and limited math skills"; "limited ability to retain and follow simple, work-related instructions"; "[d]ue to depression and cognitive limitations, she may have some problems tolerating work-related stressors, and she may be somewhat easily distracted from even simple work tasks"; "pace of completion is impaired due to physical and cognitive limitations"; "not capable of attending to and performing work tasks reasonably well even if the tasks are simple and routine in nature"; and "needs assistance managing her finances in her own best interest." *Id.*

On October 26, 2017, state agency psychological consultant Xanthia Harkness, Ph.D. ("Dr. Harkness"), reviewed the evidence and completed a psychiatric review technique ("PRT") and mental residual functional capacity ("RFC") assessment. Tr. at 71–73. She considered listings 12.02 for neurocognitive disorders and 12.04 for depressive, bipolar, and related disorders and assessed moderate difficulties in Plaintiff's abilities to understand, remember, or apply information, interact with others, and adapt

7

or manage herself, and marked difficulties in her ability to concentrate, persist, or maintain pace. Tr. at 71–76. She rated Plaintiff as "moderately limited" in her abilities to understand and remember detailed instructions, carry out very short and simple instructions, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in work setting, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. Tr. at 74–76. She considered Plaintiff to be "markedly limited" in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual without customary tolerances, sustain an ordinary routine without special supervision, and complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* She explained:

> Cl[aiman]t's statements are reasonably consistent with the total [medical evidence of record] since they are supported by the psych testing, obj[ective mental status exam] observations and the third party adls. The medical opinions of Dr. Ritterspach at the [consultative exam] are persuasive and reasonably well supported by the total [medical evidence of record]. The cl[aiman]t has a neurocog[nitive] decline of unknown origin and

8

moderately severe depression. Psych testing indicates a significant decline from the former higher level of cognitive functioning. In particular the cl[aiman]t's deficit in processing speed and [short-term memory] would make it difficult to adequately persist in carrying out even [simple, routine, repetitive tasks] on a consistent basis with adequate pace and persistence. She requires more support to remember and carry out tasks in her daily life than would be typically provided in any competitive work setting. Reasonable onset is 2/2/17 as alleged. The cl[aiman]t's impairment is expected to endure for a consistent period of at least 12 months. A short diary of 18 months is recommended due to her potential to improve cognitively and emotionally with effective tr[eatmen]t for her major depressive dis[order], since her cognitive decline may be tied to her depression.

Tr. at 73.

> b.    Evidence Between October 2017 Disability Finding and September 2021 Cessation

Plaintiff complained of left-sided numbness on September 22, 2020. Tr. at 596. She described intermittent numbness and weakness in her arm, hand, and foot that had been worsening over the prior year. Tr. at 600. Physician assistant Erik Osborne ("PA Osborne") noted tenderness along the clavicle with palpation, left upper cervical tenderness, muscle spasms in the scalene muscles on the left side, and 1+ non-pitting edema. Tr. at 601. He ordered blood work and indicated Plaintiff's symptoms were likely due to cervical impingement. *Id.*

On April 6, 2021, Plaintiff reported random pain in her legs and requested a referral to a vascular clinic to be tested for a blood clot. Tr. at

592. PA Osborne noted muscle spasms in the scalene muscles on Plaintiff's left side and 1+ bilateral pitting edema. Tr. at 593. He indicated Plaintiff's blood pressure was on the high end of the normal range and encouraged her to monitor it more often. *Id.* He ordered D-dimer testing and indicated he would order a Doppler ultrasound if it was elevated. *Id.*

On May 20, 2021, a chest computed tomography ("CT") scan showed no acute cardiopulmonary processes, and an abdominal and pelvic CT scan suggested possible mucinous cystadenoma and ovarian cysts. Tr. at 699–70. A pelvic ultrasound confirmed adenomyosis, fibroids, and an ovarian cyst on May 24, 2021. Tr. at 656.

Plaintiff presented to Lisa Bridgewater, Ph.D. ("Dr. Bridgewater"), for a consultative psychological exam on July 21, 2021. Tr. at 670–73. She reported fatigue, pain, concentration problems, fibromyalgia, memory issues, sleep problems, anxiety, and depression. Tr. at 670. Dr. Bridgewater reviewed records provided by the disability examiner, obtained Plaintiff's history, and conducted a clinical examination. *Id.* Plaintiff reported she was anxious "more than anything." Tr. at 671. She explained her level of anxiety depended on her sleep, whether she was experiencing a flare-up in some area, and her pain. *Id.* She stated she often woke due to pain and described some stabbing and shooting pain. *Id.* Plaintiff described mind racing and feeling nervous and restless. *Id.* She stated her pain caused her to experience fear,

feel depressed "a few times a week," and sleep erratically. *Id.* She reported waking several times during the night. *Id.* Plaintiff endorsed inconsistent ability to function that varied based on her sleep and pain. *Id.* Dr. Bridgewater noted Plaintiff's slowed motor functions and speech rate and lack of energy, although Plaintiff spoke at a normal volume. *Id.* Dr. Bridgewater indicated Plaintiff's overall mood appeared dysphoric and her affect was flat. *Id.* She described Plaintiff's ability to form thoughts as somewhat slowed. *Id.* She found no indication of any thought blocking, loose associations, or flight of ideas. *Id.* Dr. Bridgewater noted that Plaintiff seemed to feel hopeless and helpless in the face of her reported pain. *Id.* She stated Plaintiff's attention and concentration appeared somewhat mildly-impaired. *Id.*

Dr. Bridgewater administered the WAIS-IV, and Plaintiff achieved scores of 102 for verbal comprehension, 96 for perceptual reasoning, 89 for working memory, 84 for processing speed index, 92 for full scale intelligence quotient ("IQ"), and 99 for general ability index. Tr. at 672. Dr. Bridgewater explained:

> Ms. S['s] current scores were compared to her previous scores obtained in 2017. In that testing on the WAIS-IV, she obtained a Full Scale IQ score of 72, which was in the borderline range. This is in contrast to her Full Scale IQ score of 92 at this point, which is in the average range. The main differences were in her Perceptual Reasoning, Working Memory, and Processing Speed Indexes. Previously, her Working Memory score was in the

borderline range and Processing Speed score in the extremely low range, whereas now they were both in the low average range. It appears she has made progress since that time. She does exhibit some weakness in the area of math and this was the main reason that her working memory score was actually lower. She performed well on Digit Span obtaining a scaled score of 11, but only 5 on Arithmetic, which may suggest the previous problems with math as she had described. Overall, she did not exhibit any significant cognitive difficulties.

*Id.* Dr. Bridgewater diagnosed adjustment disorder with anxiety and depression and unspecified attention deficit hyperactivity disorder ("ADHD") and indicated a need to rule out possible specific learning disorder in mathematics. Tr. at 673. She described Plaintiff as "quite lethargic" and noted her ADLs appeared to be mainly limited due to pain and fatigue. *Id.* She stated Plaintiff was able to understand and carry out instructions, although she had some difficulty retaining information in memory, likely due to affective anxiety, depression, fatigue, and pain. *Id.* She opined that Plaintiff's ability to deal with stress seemed quite impaired. *Id.*

Plaintiff presented to Nelsa Ciapponi, M.D. ("Dr. Ciapponi"), for a consultative physical examination on August 28, 2021. Tr. at 677–79. She complained of fatigue, fibromyalgia, joint pain, and chronic pain. *Id.* She indicated she was unable to work due to pain and fatigue, decreased focus and concentration, and low energy. *Id.* She described her pain as usually "sharp and intense" and lasting for several minutes off and on, although she admitted she experienced minimal pain on some days. *Id.* Dr. Ciapponi noted

Plaintiff walked into the exam room unassisted and described her gait as normal, somewhat slow, and non-antalgic. Tr. at 678, 679. She found that Plaintiff had multiple tender points and that he opined would likely make lifting and carrying medium or large objects difficult. Tr. at 679. Dr. Ciapponi noted that Plaintiff's affect was somewhat flat, but she was able to focus and follow through fully with instructions. *Id.* She indicated that the tenderness in Plaintiff's upper extremities might also make it difficult for her to perform prolonged lifting or reaching, as well as stooping and crouching. *Id.*

Plaintiff was evaluated in the emergency room ("ER") on September 3, 2021, for racing heart rate, intermittent chest pain, and intermittent shortness of breath. Tr. at 713. An electrocardiogram ("EKG") was normal. Tr. at 714. Chest x-rays showed no acute cardiopulmonary processes. *Id.* The attending physician assessed palpitations and chest pain and released Plaintiff with instructions to follow-up with a cardiologist and her primary care doctor. *Id.*

On September 13, 2021, state agency psychological consultant Janet Boland, Ph.D. ("Dr. Boland"), reviewed the record and completed a PRT and RFC assessment. Tr. at 86–88, 93–96 96–98. She considered listings 12.04, 12.06 for anxiety and obsessive-compulsive disorders, and 12.11 for neurodevelopmental disorders, assessing moderate difficulties in Plaintiff's abilities to understand, remember, or apply information, mild difficulties in

her ability to interact with others, moderate difficulties in her abilities to concentrate, persist, or maintain pace, and mild difficulties in her abilities to adapt or manage herself. Tr. at 86–88. Dr. Boland indicated Plaintiff was moderately-limited in her abilities to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. Tr. at 93–96, 96–98. She explained:

> Overall, while the severity of this claimant's combined mental conditions is considered severe, it is not deemed of sufficient severity to preclude all forms of work. Based on the objective medical evidence in the file in combination with her reported adaptive functioning, she appears to retain the basic mental capacity needed to perform simple, unskilled work tasks at this time. M[edical] I[mprovement] has occurred.

Tr. at 95.

On September 16, 2021, state agency medical consultant Lindsey Crumlin, M.D. ("Dr. Crumlin"), reviewed the evidence and completed a physical RFC. Tr. at 90–93. She found Plaintiff had the RFC to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of six hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. *Id.*

c.     Evidence After 2021 Disability Cessation

Plaintiff was evaluated in the ER on November 13, 2021, for shortness of breath, worsening chest pain, left neck and jaw pain, palpitations, intermittent wheezing, and diarrhea. Tr. at 732. An EKG was negative, and chest x-rays showed no acute abnormalities. Tr. at 733. The attending physician assessed chest pain and shortness of breath and ordered a Ketorolac injection. *Id.* He discharged Plaintiff in stable condition. *Id.*

On November 17, 2021, Plaintiff reported intermittent chest pain, jaw pain, headaches, intermittent leg pain, increased back pain, neck pain, and possible heart issues. Tr. at 755. PA Osborne noted obesity, neck pain with limited ROM and muscle rigidity, left-sided scalene muscle spasms, and bilateral edema on exam. Tr. at 755–56. He assessed atypical chest pain, headaches, jaw pain, neuropathy, intermittent palpitations, menopause, and vitamin D deficiency. Tr. at 756. He ordered blood work and an echocardiogram, referred Plaintiff to a chiropractor, and prescribed Vascepa. *Id.*

Plaintiff presented to the ER on February 11, 2022, with complaints of dizziness, thirst, lightheadedness, stomach and leg cramps, diffuse myalgias, and low magnesium. Tr. at 892. An EKG was negative for ischemic changes. Tr. at 893. Chest x-rays showed no evidence of active intrathoracic disease. *Id.* The attending physician assessed lightheadedness and myalgia. *Id.*

15

On March 2, 2022, a second state agency psychological consultant, Jennifer Steadham, Ph.D. ("Dr. Steadham"), reviewed the evidence and completed a PRT and a mental RFC assessment. Tr. at 112–13, 116–17. She considered listings 12.02, 12.04, 12.06, and 12.11 and assessed mild difficulties in Plaintiff's abilities to interact with others and adapt or manage herself and moderate difficulties in her abilities to understand, remember, or apply information and concentrate, persist, or maintain pace. *Id.* Dr. Steadham assessed moderate limitations in Plaintiff's abilities to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods. Tr. at 116–17.

On March 3, 2022, a second state agency medical consultant, James Taylor, M.D. ("Dr. Taylor"), assessed a similar physical RFC to the one assessed by Dr. Crumlin, except he found Plaintiff could frequently stoop, kneel, crouch, crawl, and climb ramps and stairs and should avoid concentrated exposure to hazards. *Compare* 90–93, *with* Tr. at 115–16.

Plaintiff presented to Sarah N. Morris, M.D. ("Dr. Morris"), to establish gynecological care on March 16, 2022. Tr. at 841. She reported left-sided pain. *Id.* A pelvic ultrasound showed a retroverted and slightly enlarged uterus, two intramural fibroids, and Nabothian cysts. Tr. at 843. Dr. Morris recommended weight-bearing exercise and a healthy diet. *Id.*

16

Plaintiff presented to the ER on April 12, 2022, for evaluation of rectal bleeding, dizziness, mild lower back pain, and lightheadedness. Tr. at 1059. An EKG was normal. Tr. at 1060. The attending physician assessed bright red rectal bleeding and dizziness. *Id.*

Plaintiff returned to the ER on April 22, 2022, for evaluation of bilateral leg spasms, shaking, and trembling, difficulty walking, and lower back pain. Tr. at 981. The attending physician observed intermittent bilateral lower extremity tremors, but indicated they were "intentional." Tr. at 982. He ordered administration of Valium, assessed bilateral leg muscle spasms, and prescribed Cyclobenzaprine. *Id.*

On June 29, 2022, Plaintiff presented to the ER with intermittent chest pain and pressure and upper back tightness. Tr. at 1151. An EKG was normal. Tr. at 1154. The attending physician assessed nonspecific chest pain. Tr. at 1152.

Plaintiff next presented to the ER on July 26, 2022, with complaints of intense head pressure, right eye visual changes, blurred vision, lightheadedness, dizziness, and headaches. Tr. at 1238. A physical exam was unremarkable. Tr. at 1239. A CT scan of Plaintiff's brain and head showed no evidence of acute intracranial abnormalities. *Id.* The attending physician assessed a headache and ordered blood work. *Id.*

17

Plaintiff presented to clinical physician assistant Michael McCarthy ("PA McCarthy") for inner ear vertigo, dizziness, sinus congestion, ear pain and pressure, postnasal drip, swollen neck lymph nodes, lower left ankle swelling, mild fatigue, and nausea on August 12, 2022. Tr. at 1476–77. PA McCarthy noted obesity, serous fluid in Plaintiff's bilateral ears, and bilateral lower extremity edema. Tr. at 1477. He assessed bilateral eustachian tube dysfunction, abnormal gait, fatigue, and mild bilateral peripheral venous insufficiency. *Id.* He ordered blood work, referred Plaintiff to a neurologist, and prescribed Fluticasone. *Id.*

On October 18, 2022, Plaintiff presented to neurologist Steven F. Karner, M.D. ("Dr. Karner"), for evaluation of impaired gait and balance, back pain, headaches with sensitivity to light and sound, numbness in the bilateral arms, hands, and feet, difficulty walking, dizziness, incoordination, concentration problems, palpitations, ankle swelling, shortness of breath, neck pain, joint pain, tinnitus, blurry vision, and difficulty sleeping. Tr. at 790. A physical exam was normal, aside from slightly elevated blood pressure and high body mass index ("BMI"). Tr. at 791–92. Dr. Karner assessed an unsteady gait, joint pain, and migraines. Tr. at 792. He referred Plaintiff to a rheumatologist, ordered magnetic resonance imaging ("MRI") of her brain, prescribed Rizatriptan for migraines, and advised Plaintiff to maintain a calendar of her symptoms, as he suspected there might be an association

18

between migraines and unsteadiness. *Id.* The MRI of Plaintiff's brain was normal. *Id.*

Plaintiff presented to the ER on December 12, 2022, for worsening shortness of breath, heart fluttering, headaches, occasional heart palpitations, and a rash on the right side of her abdomen. Tr. at 1319. Both physical and mental status exams were normal. Tr. at 1319–20, 1380. An EKG was normal, and chest x-rays showed no active disease. Tr. at 1320. The attending physician assessed gastroesophageal reflux disease ("GERD") and shortness of breath and prescribed Atenolol. Tr. at 1320, 1328.

On January 10, 2023, Plaintiff reported to the ER with complaints of right-sided abdominal pain, diarrhea, an intermittent cough, GERD, chills, and temperature fluctuations. Tr. at 1412. She endorsed right lower quadrant and mid-abdominal tenderness on exam. Tr. at 1413. An abdominal and pelvic CT scan was negative for acute abdominopelvic pathology. Tr. at 1447–48. The attending physician assessed abdominal pain, prescribed Dicyclomine and Atenolol, and discharged Plaintiff in stable condition. Tr. at 1413, 1422.

Plaintiff presented to nurse practitioner Sarah B. Hogge ("NP Hogge") to reestablish care on March 22, 2023. Tr. at 816. She reported fatigue, bone pain, shoulder and neck stiffness, amenorrhea, arthralgias, bilateral hand and foot pain, hand joint swelling, abnormal glucose levels, vitamin

deficiency, intermittent suprapubic pain, and worsening stress incontinence. Tr. at 816–17. A physical exam was normal. Tr. at 817–18. NP Hogge assessed amenorrhea, arthralgia, abnormal glucose levels, fatigue, vitamin deficiency, suprapubic pain, and stress incontinence. Tr. at 818–19. She ordered blood work and a pelvic ultrasound and referred Plaintiff to a gastroenterologist and a urologist. *Id.*

Plaintiff presented to physician assistant Jeff Seegers ("PA Seegers") with complaints of rib and chest pain on May 16, 2023. Tr. at 1471. PA Seegers recorded normal findings on physical exam, aside from obesity. *Id.* He assessed chest wall pain and obesity. *Id.* He offered to prescribe Cyclobenzaprine, but Plaintiff refused the prescription. *Id.*

On June 2, 2023, Plaintiff endorsed increased worsening joint pain, pain in her fingers, shoulder, inner scapula, neck, lower back, knees, ankle, feet, and heels, swelling in her fingers, ankles, and feet, morning stiffness, back and neck stiffness, difficulty sleeping due to pain in her heels, feet, and big toes, pain after a car accident, neck arthritis, dry eyes, mild mouth dryness, edema, dysphagia, heartburn, urinary incontinence, dizziness, extremity weakness and numbness, insomnia, muscle cramping and weakness, myalgia, gait disturbance, lymphadenopathy, and lightheadedness. Tr. at 1503–04, 1505. Physician assistant Erin Siceloff ("PA Siceloff") noted the presence of 18 positive tender joints, discomfort with

flexion and extension in Plaintiff's cervical spine, and tenderness to palpation over her paralumbar region and bilateral trochanteric bursa. Tr. at 1508. X-rays of Plaintiff's cervical spine showed grade one anterolisthesis of C2–3 on neutral and flexion view, mild retrolisthesis of C3–4 and C4–5 on extension view, and moderate multilevel degenerative disc and joint changes. Tr. at 1487. X-rays of Plaintiff's bilateral hands showed osteoarthritis greatest within her thumb carpometacarpal joint and fifth digit distal interphalangeal joints. Tr. at 1490. X-rays of her lumbar spine showed transitional lumbosacral anatomy, rudimentary disc at S1–2, and minimal posterior L4–5 and L5–S1 disc space narrowing. Tr. at 1492. PA Siceloff assessed cervicalgia, lower back pain, bilateral hand pain, and bilateral foot pain. Tr. at 1506. She prescribed Progesterone. Tr. at 1507.

On June 6, 2023, an ultrasound of Plaintiff's feet and ankles was normal. Tr. at 1494.

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing, Plaintiff testified she was 5'4" tall and weighed 190 pounds. Tr. at 46. She stated she lived with her husband. *Id.*

Plaintiff denied receiving current treatment for mental health issues, although she said she continued to deal with anxiety and depression. Tr. at

50. She denied taking any medication specifically for anxiety, but stated her hormone therapy provided some relief of her anxiety. Tr. at 50–51. She indicated anxiety contributed to her difficulty working, but was not the main problem. Tr. at 51. She testified incontinence, pain, fatigue, numbness in her hands and feet, trouble sitting and standing for long periods, and arthritis prevented her from working. Tr. at 52. She denied taking any medication. *Id.*

Plaintiff confirmed she had been referred to a urologist, but said she had not attended the appointment because she was ill. Tr. at 53. She stated she experienced pain due to a history of leaking breast implants. *Id.* She described pain in her neck that radiated between her shoulder blades and down her arms and her back. Tr. at 54. She stated she had migraines two to three times per week. *Id.* She said foot pain woke her at night. *Id.* She also endorsed pain in her hands, fingers, toes, and knees and numbness in her hands and feet. *Id.* She said her arthritis specialist had referred her to a spinal specialist. *Id.*

Plaintiff testified she did not take pain medication because of a prior addiction. Tr. at 54–55. She said she sometimes used fish oil and magnesium to treat her symptoms. Tr. at 55. She confirmed she had recently returned to Arthritis Consultants for treatment, but it had taken a while to obtain a referral because her primary care doctor left his practice, and she needed lab studies that her insurance declined to cover. *Id.*

22

Plaintiff said her pain "tire[d her] out" and she tended to lie down more when she had a "rough day." Tr. at 56. She stated her foot pain interrupted her sleep. Tr. at 57. She testified she had stopped driving in 2017 or 2018 due to problems with memory, concentration, focus, and pain. *Id.* She indicated she required her husband's assistance or grasped the walls, rails, and furniture as she moved about her house. Tr. at 58. She denied being able to walk 100 yards without assistance due to pain in her feet, legs, and low back and problems with balance. Tr. at 59. She claimed her leaking breast implants had caused her joint pain and problems with concentration, memory, and focus. Tr. at 58, 59. She endorsed difficulty managing household bills, remembering appointments, and completing household chores, although she admitted she could heat food in the microwave, fold laundry for a few minutes at a time, and put away dishes for up to 10 minutes. Tr. at 59–60. She said the numbness and tingling in her hands caused her to drop items and indicated her left hand was worse than her right. Tr. at 60. She stated she had difficulty reaching overhead. *Id.* She indicated her migraines lasted all day. *Id.*

Plaintiff testified she experienced back and neck pain upon sitting. Tr. at 61. She said she had difficulty turning her neck from side to side. *Id.*

23

b.     Vocational Expert Testimony

Vocational Expert ("VE") Sabrina Singleton, Ph.D., reviewed the record and testified at the hearing. Tr. at 62–65. The VE categorized Plaintiff's PRW as an advertising sales representative, *Dictionary of Occupational Titles* ("*DOT*") No. 254.357-014, requiring light exertion and a specific vocational preparation ("SVP") of 6; a uniform sales representative, *DOT* No. 261.357-034, requiring light exertion and an SVP of 6; and a furniture salesperson, *DOT* No. 270.357-030, requiring light exertion per the *DOT* and medium exertion as performed and an SVP of 4. Tr. at 62.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk up to six hours in an eight-hour day, sit up to six hours in an eight-hour day, occasionally use bilateral foot controls, frequently climb ramps and stairs, occasionally climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, and crawl; frequently handle and finger bilaterally; frequently reach bilaterally, avoid work at unprotected heights and around hazardous machinery, be exposed to no more than moderate noise, and would require access to a restroom within a two- to three-minute walk. Tr. at 62–63. The VE testified that the hypothetical individual would be able to perform Plaintiff's PRW as a furniture sales representative as generally performed and her PRW as a uniform sales representative as

24

actually and generally performed. Tr .at 63. The ALJ asked whether there were any other jobs that the hypothetical person could perform. *Id.* The VE identified jobs requiring light exertion and an SVP of 2 as a storage facility rental clerk, *DOT* No. 295.367-026, a merchandise marker, *DOT* No. 209.587-034, and a non-postal mail clerk, *DOT* No. 209.687-026, with 63,000, 227,000, and 13,000 positions in the national economy, respectively. Tr. at 63–64.

As a second hypothetical question, the ALJ asked the VE to consider the individual described in the first question, except that she would be limited to lifting 10 pounds occasionally and less than 10 pounds frequently and standing and walking for two hours in an eight-hour workday. Tr. at 64. The VE confirmed that Plaintiff's PRW would be eliminated. *Id.* She identified sedentary jobs with an SVP of 2 as a document preparer, *DOT* No. 249.587-018, an addresser, *DOT* No. 209.587-010, and a call-out operator, *DOT* No. 237.367-014, with 19,000, 3,000, and 3,000 positions in the national economy, respectively. *Id.*

The ALJ asked the VE to further consider that the individual would be limited to performing routine, repetitive tasks and maintaining concentration, persistence, and pace for two-hour periods during the workday. *Id.* She asked if these conditions would eliminate Plaintiff's PRW. Tr. at 65. The VE confirmed that it would. *Id.* The ALJ asked if the other jobs

at the sedentary and light exertional levels would remain available. *Id.* The VE testified they would. *Id.*

The ALJ asked the VE to further assume the individual would require at least two unscheduled absences per month. *Id.* He asked if there would be any jobs available. *Id.* The VE testified there would be no jobs. *Id.* She confirmed her testimony as to absences, maintaining concentration, persistence, and pace, and access to a restroom were based on her professional education, training, and work experience, as they were not addressed in the *DOT. Id.*

### 2.    The ALJ's Findings

In her decision, the ALJ made the following findings of fact and conclusions of law:

1.    The most recent favorable medical decision finding that the claimant was disabled is the determination dated October 27, 2017. This is known as the "comparison point decision" or CPD.

2.    At the time of the CPD, the claimant had the following medically determinable impairments: neurocognitive disorder and depressive disorder. These impairments were found to result in the residual functional capacity where she was able to remember location and work-like procedures (Exh. 1A/10). She was able to understand and remember short and simple instructions but for less than a two-hour period; she was unable to carry out very short and simple instructions for extended periods without special supervision; her symptoms would interfere with satisfactory completion of a normal workday/work week and require an unreasonable number of rest of cooling off periods; she would be highly distracted in the workplace; she would have difficulty responding appropriately to criticism or feedback from supervisors; she did not have the ability to work in situations

that required ongoing interaction with the public; she would not respond appropriately to changes in a routine setting; she did not have the capacity to set realistic goals independently (Exh. 1A/10).

3.  Through the date of this decision, the claimant has not engaged in substantial gainful activity (20 CFR 404.1594(f)(1)).

4.  The medical evidence establishes that, since September 1, 2021, the claimant has had the following medically determinable impairments: neurocognitive impairment, adjustment disorder with anxiety and depression, attention deficit/hyperactivity disorder (ADHD), hand arthritis, cervical spondylosis, lumbar degenerative disc disease (DDD), fibromyalgia, arthralgia, arrhythmias, and obesity. These are the claimant's current impairments.

5.  Since September 1, 2021, the clamant has not had an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

6.  Medical improvement occurred on September 1, 2021 (20 CFR 404.1594(b)(1)).

7.  Since September 1, 2021, the impairments present at the time of CPD decreased in medical severity to the point where the claimant has had the residual functional capacity of working at all exertional levels but limited to performing routine repetitive tasks and maintaining concentration persistence and pace for 2 hour periods during the workday.

8.  The claimant's medical improvement is related to the ability to work because it resulted in an increase in the claimant's residual functional capacity (20 CFR 404.1594(c)(3)(ii).

9.  Since September 1, 2021, the claimant has continued to have a severe impairment or combination of impairments (20 CFR 404.1594(f)(65)).

10. Based on the impairments present since September 21, 2021, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except lifting and carrying twenty pounds occasionally, ten pounds frequently; standing/walking up to six hours in an eight-hour day; sitting up to six hours in an eight-hour day; occasional foot controls, bilaterally; frequent climbing ramps and stairs; occasional climbing ladders, ropes or scaffolds; frequent stooping, kneeling, crouching and crawling; frequent handling/fingering, bilaterally;

frequent reaching bilaterally; must avoid working around unprotected heights and hazardous machinery; limited to performing routine repetitive tasks and maintaining concentration, persistence and pace for 2 hour periods during the workday.

11. Since September 1, 2021, the claimant has been unable to perform past relevant work (20 CFR 404.1565).

12. On September 1, 2021, the claimant was a younger individual age 18–49. On November 13, 2023, the claimant changed age categories to an individual closely approaching advanced age (20 CFR 404.1563).

13. The claimant has at least a high school education (20 CFR 404.1564).

14. Since September 1, 2021, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

15. Since September 1, 2021, considering the claimant's age, education, work experience, and residual functional capacity based on the impairments present since September 1, 2021, the claimant has been able to perform a significant number of jobs in the national economy (20 CFR 404.1560(c) and 404.1566).

16. The claimant's disability ended on September 1, 2021, and the claimant has not become disabled again since that date (20 CFR 404.1594(f)(8)).

Tr. at 19–32.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ did not support her finding of medical improvement; and

2) the ALJ did not consider fibromyalgia in accordance with SSR 12-2p and relevant case law.

28

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

An individual's continued entitlement to disability benefits must be reviewed periodically. 20 C.F.R. § 404.1594(a). In reviewing whether an individual continues to be entitled to benefits, the ALJ "must determine if there has been any medical improvement in [the individual's] impairment(s) and, if so, whether this medical improvement is related to [her] ability to work." *Id.* "If medical improvement related to [the individual's] ability to work has not occurred and no exception applies, [her] benefits will continue." *Id.*

The regulations set forth a series of steps for determining whether an individual's disability continues or has ceased. 20 C.F.R. § 404.1594(f). The review should end, and benefits should be continued if, at any point, the adjudicator determines there is sufficient evidence to conclude the individual cannot engage in substantial gainful activity. *Id.*

At the first step, the adjudicator considers whether the individual is engaging in substantial gainful activity. 20 C.F.R. § 404.1594(f)(1). If the individual is engaging in substantial gainful activity and any applicable trial

work period has ended, the adjudicator is to find the individual's disability has ended and should not proceed to subsequent steps. *Id.*

At the second step, the adjudicator asks whether the individual has an impairment or combination of impairments that meets or equals the severity of a listed impairment. 20 C.F.R. § 404.1594(f)(2). If the individual's impairment meets or equals a listing, her disability continues. *Id.*

At the third step, the adjudicator considers whether medical improvement has occurred, as shown by a decrease in medical severity. 20 C.F.R. § 404.1594(f)(3).

At the fourth step, if medical improvement has occurred, the adjudicator assesses whether it is related to the claimant's ability to work. 20 C.F.R. § 404.1594(f)(4).

At step five, the adjudicator assesses whether an exception applies if there has been no medical improvement or if medical improvement is unrelated to the claimant's ability to work. 20 C.F.R. § 404.1594(f)(5). If no exception applies, the claimant's disability continues. *Id.* If one of the exceptions in the second group applies, the individual's disability has ended. *Id.*

If medical improvement is related to the individual's ability to work or if an exception in the first group applies, the adjudicator determines at step

six whether all the individual's impairments, considered in combination, are severe. 20 C.F.R. § 404.1594(f)(5), (6).

The adjudicator evaluates the individual's RFC at the seventh step and determines whether it allows for performance of her PRW. 20 C.F.R. § 404.1594(f)(7). An individual is not disabled within the meaning of the Act if her RFC would allow her to return to PRW as it is customarily performed in the economy or as the individual actually performed the work. *See* 20 C.F.R. § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The individual bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). The adjudicator may forego step six and proceed to step eight if the evidence regarding the individual's PRW is insufficient or if the individual has no PRW. 20 C.F.R. § 404.1594(f)(9).

If the individual's RFC does not allow her to perform her PRW, at the eighth step the adjudicator considers whether her RFC allows her to perform other work given her age, education, and past work experience. 20 C.F.R. § 404.1594(f)(8). Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW or if the individual has no PRW, the burden shifts to the Commissioner to come forward with evidence that the individual can perform alternative work that exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national

economy that the individual can perform. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies the burden, the individual must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

   2. The Court's Standard of Review

  The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

  The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390,

401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Medical Improvement Evaluation

Plaintiff argues the ALJ's finding of medical improvement is arbitrary and not based on the evidence. [ECF Nos. 11 at 13 and 13 at 1]. She maintains any improvement in her impairments was unrelated to her ability to work. [ECF No. 11 at 13–14]. She contends the ALJ's finding that she did not "exhibit any significant cognitive difficulties" at the time of Dr. Bridgewater's exam is unsupported. *Id.* at 14. She points out Dr. Bridgewater also opined that she had some difficulty holding information in memory and that her ability to deal with stress seemed "quite impaired." [ECF No. 13 at 2]. She further submits the ALJ erred in citing her ability to follow commands during an ER visit as evidence that she had no cognitive difficulties. [ECF No. 11 at 14]. She claims she developed additional

impairments following the allowance of benefits that combined to impact her ability to work. *Id.* She indicates the record contains no evidence from September 1, 2021, to establish it as the date of medical improvement. [ECF No. 13 at 3].

The Commissioner argues substantial evidence supports the ALJ's finding that Plaintiff had experienced medical improvement as of September 1, 2021, such that she could perform a significant number of jobs in the economy. [ECF No. 12 at 9]. He maintains the ALJ supported her finding by referencing the 20-point change in Plaintiff's IQ score between the 2017 and 2021 exams, Dr. Bridgewater's observation that Plaintiff did not exhibit any significant cognitive difficulties, Plaintiff's ability to follow commands during a February 2022 exam, Plaintiff's largely normal mental status exam findings from November 2021 through May 2023, and Dr. Steadham's opinion. *Id.* at 9–10.

Pursuant to 20 C.F.R. § 404.1594(b)(1):

Medical improvement is any decrease in the medical severity of your impairment(s) which was present at the time of the most recent medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on improvement in the symptoms, signs, and/or laboratory findings associated with your impairment(s).

The undersigned recommends the court find the ALJ reasonably concluded and rationally explained her reasons for concluding Plaintiff had

experienced medical improvement as of September 1, 2021. The ALJ's
decision reflects her careful evaluation of evidence showing the symptoms
and signs associated with Plaintiff's mental impairments had improved
between 2017 and 2021 such that as of September 1, 2021, she was no longer
disabled within the meaning of the Social Security Act.

> The ALJ explained her finding of medical improvement as follows:
>
> The medical evidence supports a finding that, by September 1,
> 2021, there had been a decrease in medical severity of the
> impairments present at the time of the CPD. The medical
> evidence showed that on July 21, 2021, the claimant had a
> Psychological Consultative Examination completed (Exh. 12F/1).
> It was noted that her present Full Scale IQ score of 92, was
> compared to her Full Scale IQ score in 2017, which was 72 (Exh.
> 12F/3). The doctor indicated that overall she did not exhibit any
> significant cognitive difficulties (Exh. 12F/3). Additionally, the
> medical evidence showed that during an appointment on
> February 11, 2022, she was able to follow commands (Exh.
> 19F/78, 85).

Tr. at 22–23.

Although Plaintiff argues the ALJ erred in finding medical
improvement occurred "on" September 1, 2021, the ALJ actually found
medical improvement had occurred "by" September 1, 2021. Pursuant to 20
C.F.R. § 404.1594(g): "If the evidence shows that you are no longer disabled,
we will find that your disability ended at the earliest of the following months:
. . . (2) The month the evidence shows you are no longer disabled under the
rules set out in this section, but no earlier than the month in which we mail

you a notice saying that the information we have shows that you are not disabled." Because the notice was mailed to Plaintiff on September 27, 2021, the ALJ's finding of medical improvement on September 1, 2021, was made in accordance with the regulation.

The ALJ noted Plaintiff had "testified that she thought she was more disabled due to her physical impairments versus her mental impairments," which differed from the 2017 evidence. Tr. at 30. She wrote: "In summary of the medical evidence, the claimant had previously received disability benefits, for mental impairments. Since that time, the mental impairments have improved . . . ." *Id.* This finding is supported by the evidence as discussed below.

The record fully supports the ALJ's reference to a 20-point increase in Plaintiff's IQ between the 2017 and 2021 exams to support her finding of medical improvement. *Compare* Tr. at 583–85, *with* Tr. at 670–73. Plaintiff offers and the record includes no information to suggest either score was inaccurate.

A comparison of Dr. Bridgewater's report and the ALJ's discussion refutes Plaintiff's argument that the ALJ mischaracterized Dr. Bridgewater's findings. The ALJ summarized Dr. Bridgewater's observations as follows:

> Behavioral observations showed that she was overall cooperative with the examiner (Exh. 12F/2). Her motor functions appeared to be slowed. Eye contact was good. She did appear to exhibit a lack

36

of energy. Her mood overall appeared dysphoric and her affect[] tended to be flat. Her thought form appeared somewhat slowed. There was no indication of any thought blocking, loose associations, or flight of ideas. She appeared to feel rather hopeless and helpless in the face of her reported pain. Her attention and concentration appeared to be somewhat mildly impaired (Exh. 12F/2). The results of her Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) showed that her Full Scale IQ was 92 (Exh. 12F/3). That score was compared to her previous score completed in 2017 which showed her Full Scale IQ score at that time was 72. The doctor indicated that overall, she did not exhibit any significant cognitive difficulties (Exh. 12F/3).

Tr. at 25–26. The ALJ's findings are consistent with the exam report and Dr. Bridgewater's specific statement that "[o]verall, [Plaintiff] did not exhibit any significant cognitive difficulties." Tr. at 672.

Although Plaintiff argues the ALJ erred in citing her ability to follow commands during a February 2022 exam as indicative of her medical improvement, she does not explain how this was error. In summarizing the evidence after September 2021, the ALJ noted Plaintiff's abilities to participate in motor and coordination testing, regulate eye contact and affect, and cooperate during exams, which were indicative of an ability to follow commands. *See* Tr. at 26–28. Thus, Plaintiff's ability to follow commands during the February 2022 exam is not an anomaly as compared to her abilities during other exams after September 2021. Furthermore, her ability to follow commands during later exams stands in stark contrast to the

difficulties she demonstrated during NP Green's 2017 consultative exam. *See generally* Tr. at 576–80.

Although Plaintiff maintains improvement in her impairments was unrelated to her ability to work, the ALJ reasonably concluded Plaintiff's medical improvement was related to her ability to work "because it resulted in an increase in [her RFC]." Tr. at 23. She explained that Plaintiff had a much less restricted mental RFC in September 2021, as compared to her mental RFC in October 2017.

In furtherance of her conclusion, the ALJ set forth Plaintiff's RFC as reflected in the October 27, 2017 decision for comparison. *See* Tr. at 19 (noting that due to neurocognitive disorder and depressive disorder, Plaintiff "was able to understand remember short and simple instructions but for less than a two-hour period," was "unable to carry out very short and simple instructions for extended periods without special supervision," had "symptoms [that] would interfere with satisfactory completion of normal workday/work week and require an unreasonable number of rest or cooling off periods", "would be highly distracted in the workplace," and "would have difficulty responding appropriately to criticism or feedback from supervisors," among other limitations).

The ALJ found that "[s]ince September 1, 2021, the impairments present at the time of the CPD decreased in medical severity to the point

where the claimant has had the residual functional capacity of working at all exertional levels but limited to performing routine repetitive tasks and maintaining concentration persistence and pace for 2 hour periods during the workday." Tr. at 23. However, she noted she had "not considered the limiting effects of the impairments that developed after the CPD" in reaching such a conclusion. *Id.*

The ALJ's assessment of Plaintiff's mental RFC as of September 2021 was supported by her allocation of "somewhat persuasive" authority to Dr. Bridgewater's impressions that Plaintiff "was able to understand and carry out instructions, but she had some difficulty holding information in her memory which might mainly be due to the affective anxiety, depression, fatigue, and pain" and that "her ability to deal with stress would be quite impaired (Exh. 12F/4)." Tr. at 29. It was also bolstered by the ALJ's allocation of persuasive authority to the psychological consultants' opinions that Plaintiff could understand and remember simple, but not more detailed instructions, attend to and perform simple, unskilled tasks for reasonable periods of time, interact appropriately with coworkers, supervisors, and the general public, respond appropriately to requests for change, and protect herself from common workplace safety hazards, although she would have difficulty focusing on more complex tasks for extended periods of time. Tr. at 30. She noted these opinions were consistent with the normal psychiatric

exams over the period after September 2021 that she had previously cited. *See* Tr. at 26–28.

The opinions to which the ALJ allocated persuasive authority stand in contrast the state agency psychological consultant's October 2017 opinion that Plaintiff was "markedly limited" in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual without customary tolerances, sustain an ordinary routine without special supervision, and complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. Tr. at 74–76.

Plaintiff argues her development of additional impairments following her allowance of benefits impacted her ability to work. Plaintiff is correct, but the ALJ did not fail to consider this factor, as she specifically noted she had assessed the above RFC based solely on the impairments present at the time of the CPD. *See* Tr. at 23. She subsequently assessed a more restrictive RFC based on all of Plaintiff's impairments as of September 1, 2021. *See* Tr. at 23–30. Despite Plaintiff's development of additional impairments after 2017, the ALJ explained that her RFC allowed for the performance of the identified jobs. *See generally* Tr. at 31–32.

40

Given the evidence of record and the ALJ's thorough and reasonable explanation, the undersigned recommends the court find substantial evidence supports her conclusion that Plaintiff had experienced medical improvement as of September 1, 2021.

### 2. Fibromyalgia

Plaintiff argues the ALJ did not evaluate fibromyalgia in accordance with SSR 12-2p and *Arakas v. Comm'r of Soc. Sec.*, 983 F.3d 83 (4th Cir. 2020). [ECF No. 11 at 15–17]. She maintains the ALJ erred in requiring objective findings to support the severity of fibromyalgia. *Id.* at 15–16; ECF No. 13 at 4. She claims the ALJ did not explain how she considered fibromyalgia-related pain and fatigue in assessing the RFC. *Id.* at 17. She contends the ALJ failed to explain how her ADLs demonstrated an ability to perform sustained work activity. [ECF No. 13 at 6–7].

The Commissioner argues the ALJ properly considered Plaintiff's fibromyalgia-related complaints. [ECF No. 12 at 10–13]. He maintains the ALJ did not require that Plaintiff's allegations of pain be validated by objective evidence, but instead relied on Plaintiff's subjective reports as contrary to her allegations. *Id.* at 11. He asserts the ALJ appropriately cited inconsistencies between Plaintiff's allegations and the other evidence of record. *Id.* at 12–13.

Fibromyalgia is "a disorder of unknown cause characterized by chronic widespread soft-tissue pain particularly in the neck, shoulders, back, and hips, which is aggravated by use of the affected muscles and accompanied by weakness, fatigue, and sleep disturbances." *Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 91 (4th Cir. 2020) (internal quotation marks and citation omitted).

The Social Security Administration ("SSA") issued SSR 12-2p as instruction to adjudicators evaluating fibromyalgia claims. SSR 12-2p, 2012 WL 3104869 (2012). SSR 12-2p refers ALJ's to the two-step process in SSR 96-7p and 20 C.F.R. § 404.1529 for evaluating an individual's statements as to symptoms and functional limitations. SSR 12-2p, 2012 WL 3104869, at *5. An individual satisfies the first step by establishing fibromyalgia as a medically-determinable impairment. *Id.* It indicates that at the second step, the ALJ "must consider all the evidence in the case record" if "objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms." *Id.; see also* 20 C.F.R. § 404.1529(c)(2) (providing the adjudicator "will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements").

"Fibromyalgia 'symptoms are entirely subjective' and '[t]here are no laboratory tests for the presence or severity of fibromyalgia.'" *Arakas*, 983 F.3d at 91 (quoting *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)). Consequently, examinations generally produce normal results, including full ROM, no joint swelling, normal muscle strength, and normal neurological reactions. *Id.* at 96.

After having established fibromyalgia as a medically-determinable impairment, the individual is "entitled to rely exclusively on subjective evidence to prove" her symptoms are "so continuous and/or so severe that [they] prevent [her] from working a full eight hour day." *See Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006). "At this step, objective evidence is *not* required to find the claimant disabled." *Arakas*, 983 F.3d at 95 (emphasis in original). Thus, an ALJ cannot rely on the absence of objective medical evidence to reject a claimant's allegations regarding the intensity, persistence, and limiting effects of fibromyalgia. *See* SSR 16-3p, 2016 WL 1119029; *see also Lewis v. Berryhill*, 858 F.3d 858, 866 (4th Cir. 2017) (finding an ALJ "improperly increase[s]" the claimant's "burden of proof" by requiring subjective descriptions of symptoms to be verified by objective medical evidence).

Nevertheless, ALJs may reject claimants' subjective allegations of symptoms in the face of contrary evidence. They should analyze "whether

there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the individual's] statements and the rest of the evidence, including [the individual's] history, the signs and laboratory findings, and statements by [the individual's] medical sources or other persons about how [her] symptoms affect [her]." 20 C.F.R. § 404.1529(c)(4). Evidence relevant to the evaluation includes the following factors set forth in the regulations: (1) the individual's ADLs; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

The ALJ recited Plaintiff's allegations as follows:

The claimant indicated on her Report of Continuing Disability Interview, that she allegedly suffers from fatigue, pain, concentration, focus, fibromyalgia, mental confusion, memory problems, sleep problems, arthritis, anxiety, and depression, which limits her ability to work (Exh. 2E/2). The claimant also indicated that she was five feet four inches tall, and she weighed 180 pounds (Exh. 2E/2). She indicated on her function report that her impairment affected her ability for lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking,

climbing stairs, seeing, remembering, completing tasks, concentrating, understanding, following instructions, and using her hands (Exh. 9E/6). Additionally, the claimant testified that she was not able to walk 100 yards unassisted. She further testified that she had difficulty completing tasks around the house and she had issues with her hands. She testified that she had issues with gripping, and when she got numbness and tingling, she could not hold anything. She testified that she dropped things, and her left hand was more worse than her right hand.

Despite those statements, the claimant indicated during a Psychological Consultative Examination, that she could do light chores, such as folding clothes and putting up the dishes (Exh. 12F/2). She also stated that if she went shopping, she went with her husband, and she was pretty dependent on him (Exh. 12F/2). During a Physical Medicine Consultative Examination, the claimant indicated that she could do some walking (Exh. 13F/4). Additionally, the claimant testified that it was her understanding, that the reason she was unable to work was mostly due to her physical impairments and not her mental impairments, though she thinks they contribute to her not being able to work.

Tr. at 24–25.

The ALJ rejected some of Plaintiff's subjective allegations, explaining:

Moreover, the medical evidence showed that the claimant was oriented to person, place and time and she could follow commands (Exh. 19F/78, 85). All the activities that the claimant reported performing are inconsistent with her previous statements. The claimant has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.

After considering the evidence of record, I find that the claimant's medically determinable impairments could have reasonably been expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent

with the objective medical and other evidence for the reasons
explained in this decision. Accordingly, these statements have
been found to affect the claimant's ability to work only to the
extent they can reasonably be accepted as consistent with the
objective medical and other evidence.

Tr. at 25.

She wrote:

Regarding her daily activities, when she gets a "flare-up," she
required more rest (Exh. 13F/3). There does not appear to be a
particular pattern. No known exacerbating factors except excess
activity. She did not like to take pain medications and was on no
prescription pain medications. She stayed home most of the time
unless she was with her husband, who accompanied her during
this appointment.

Tr. at 26. She later noted Plaintiff's failure to take prescribed medications for

her pain "would suggest her pain might not be as severe as described." Tr. at

30.

Although the ALJ considered Dr. Ciapponi's opinion somewhat

persuasive based on her finding of multiple tender points, she also indicated

it was "inconsistent with other evidence in the record, that showed that the

claimant had no tender points during any of her multiple medical

appointments." Tr. at 28. She wrote: "The medical evidence further showed

that during multiple physical examinations, the claimant had a normal gait

and normal range of motion during the musculoskeletal examinations (Exh.

15F/4, Exh. 18F/22, Exh. 19F/80, 87)." *Id.*

The above explanation shows the ALJ placed undue emphasis on the absence of objective signs and symptoms and failed to cite sufficient evidence for rejecting Plaintiff's subjective allegations in contravention of 20 C.F.R. § 404.1529, SSRs 12-2p and 16-3p, and the Fourth Circuit's holding in *Arakas*. The ALJ cited normal gait, normal ROM, and the absence of tender points during all, but Dr. Ciapponi's exam, but, having found fibromyalgia to be a severe impairment, she was not permitted rely on the absence of these signs to discount Plaintiff's subjective allegations. *See Arakas*, 983 F.3d at 96–97. Furthermore, Dr. Ciapponi was not the only provider to note the presence of tender points, as PA Siceloff found Plaintiff to have 18 positive tender points. *See* Tr. at 1508. None of the other exams reflect examination for tender points. Therefore, the only objective evidence that could reasonably support Plaintiff's fibromyalgia-related complaints was present here. *See Arakas*, 983 F.3d at 96 (finding "objective evidence [of fibromyalgia] *was present*" because the plaintiff's physician made "consistent trigger-point findings") (emphasis in original); *Brosnahan v. Barnhart*, 336 F.3d 671, 678 (8th Cir. 2003) (recognizing tendernesss in specific sites on the body as "objective evidence of fibromyalgia"); *Johnson v. Astrue*, 597 F.3d 409, 412 (1st Cir. 2010) (noting "trigger points are the only 'objective' signs of fibromyalgia").

The ALJ stated Plaintiff's reported activities of folding clothes and putting up dishes, shopping with her husband's assistance, walking, and

staying home most of the time were not limited to the extent one would expect given her complaints of disabling symptoms and limitations, but she did not explain how such activities were contrary to Plaintiff's complaints or how they would support a finding that she could complete a normal workday and workweek. Like the ALJ in *Arakas*, the ALJ "improperly disregarded [Plaintiff's] qualifying statements regarding the limited extent to which [she] could perform daily activities" and "failed to adequately explain how [Plaintiff's] limited ability to carry out daily activities support [her] conclusion that [Plaintiff] could sustain an eight-hour workday." *Id.* at 99. Plaintiff explained that she could only perform activities for periods of less than 10 minutes, walk short distances, and required her husband's presence and assistance to shop in stores and to attend appointments. "SSR 96-8p explains that the Residual Functional Capacity analysis is 'an assessment of an individual's ability to do sustained work-related' activities 'on a regular and continuing basis'—i.e., '8 hours a day, for 5 days a week or an equivalent work schedule.'" *Id.* at 100 (quoting 1996 WL 374184, at *1). The court wrote: "Even assuming, as the ALJ noted, that Arakas's 'daily activities have, at least at times, been somewhat greater than [she] . . . generally reported,' A.R. 514, he 'provided no explanation as to how those particular activities . . . showed that [s]he could persist through an eight-hour workday.'" *Id.* (quoting *Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 263 (4th Cir. 2017);

*Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018)). The same remains true here, as the ALJ did not explain how the limited activities Plaintiff described would permit her to perform work at the assessed RFC over the course of a normal workday and workweek.

The ALJ referenced the absence of a pattern to Plaintiff's flare-ups and her only known exacerbating factor being excess activity, but did not indicate how this information undermined Plaintiff's statements regarding her symptoms. In fact, such information supported Plaintiff's allegations, as waxing and waning of symptoms and exacerbation due to increased activity are characteristic of fibromyalgia. *See Arakas*, 983 F.3d at 91, 101; SSR 12-2p, 2012 WL 3104869, at *6.

Although the ALJ permissibly cited Plaintiff's failure to take prescribed medication for pain, she did not credit or resolve Plaintiff's explanation that she had declined to take it based on her history of addiction to pain medications. Pursuant to SSR 16-3p,

> [I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.

2016 WL 1119029, at *8. Thus, the ALJ glossed over the required analysis in reaching her conclusion that Plaintiff's failure to take prescription pain medication suggested her pain was not as severe as alleged.

Considering the foregoing, the undersigned recommends the court find the ALJ failed to evaluate fibromyalgia in accordance with the applicable rulings, regulations, and case precedent.

III     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

July 2, 2025
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).